[Cite as *State v. Noor*, 2014-Ohio-3397.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | : | No. 13AP-165 |
| v. | : | (C.P.C. No. 12CR-01-510) |
| Mohamed M. Noor, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on August 5, 2014

*Ron O'Brien*, Prosecuting Attorney, and *Barbara A. Farnbacher,* for appellee.

*Yeura R. Venters,* Public Defender, and *John W. Keeling,* for appellant.

APPEAL from the Franklin County Court of Common Pleas

DORRIAN, J.

{¶ 1} Defendant-appellant, Mohamed M. Noor ("appellant"), appeals from a judgment of the Franklin County Court of Common Pleas convicting him of multiple crimes and sentencing him to prison for a total of 65 years. For the following reasons, we affirm in part and reverse in part.

I. Facts

A. *Conflicting Versions of Events*

{¶ 2} Appellant's alleged crimes arose out of an incident that occurred at the apartment home of Farheyo Abdulkar ("Abdulkar") on January 21, 2012, on Eakin Road in Columbus, Ohio. All of the people present at the apartment, as well as appellant and

his codefendant, Mohamed Abdi Ibrahim ("Ibrahim"), were immigrants to the United States from their country of origin, Somalia.

{¶ 3}  The state's theory of the case was that appellant and Ibrahim intruded into Abdulkar's apartment where 11 people had gathered to watch a Somali television program transmitted via the Internet.  Appellant and Ibrahim, one of whom had a gun, demanded money and property from the occupants.  During the incident, which lasted approximately 20 to 40 minutes, one of the occupants of the apartment was shot while another was injured as the result of being struck on the head with the gun.  Ultimately, a fight ensued, and appellant and Ibrahim were overcome by the individuals at the apartment.  Both appellant and Ibrahim were injured during the fight.  Two of the occupants, including the gunshot victim, escaped the scene and called 911 from a neighbor's residence.  Police arrived shortly thereafter and found appellant and Ibrahim inside the apartment, injured and subdued. Both appellant and Ibrahim received hospital treatment after the incident, as did the victim of the gunshot wound and the individual who had been injured when struck with the gun.

{¶ 4}  The defense argued that appellant and Ibrahim went to the apartment because Ibrahim intended to purchase khat.  Khat is a substance classified as an illegal drug in Ohio but which is reputedly commonly used in the Somali community.[1]  Ibrahim testified that a dispute broke out during the drug transaction which escalated into the fight. The defense suggested that the 11 individuals in the apartment colluded to develop the false robbery story in order to conceal their own illegal drug activities.

**B. Indictment**

{¶ 5} On January 31, 2012, the state formally commenced this criminal prosecution by indicting appellant and charging him with 48 criminal counts based on the January 21, 2012 events at the Eakin Road apartment (1 count of aggravated burglary with a firearm specification, 2 counts of felonious assault with firearm specifications, 11 counts of kidnapping with firearm specifications, 11 counts of aggravated robbery with firearm

---

[1] *See State v. Samatar*, 152 Ohio App.3d 311, 2003-Ohio-1639, ¶ 12-13 (10th Dist.) (explaining that "khat" is the popular name of the plant catha edulis and that it contains the psychoactive chemical cathinone, which is listed as a Schedule I controlled substance under Ohio law, as well as the stimulant cathine, which is listed as a Schedule IV controlled substance under Ohio law).

specifications, 22 counts of robbery with firearm specifications, and 1 count of having a weapon while under disability ("WUD")).  The indictment charged Ibrahim with the same crimes, with the exception of the WUD charge.

### C. Trial

{¶ 6}  The state began its presentation of its case by calling several Columbus police officers, including Detective Arthur Hughes.  Detective Hughes testified that he was the lead detective on the case and responded to the crime scene shortly after midnight. He photographed the apartment and collected evidence, including a gun which he found outside the apartment door.  He ordered that DNA testing be performed on the gun and other evidence.  He testified that blood was spattered throughout the apartment and that he found a number of miscellaneous items, including cash, in the middle of the room, and observed an overturned flat-screen television. He further testified that a ski mask, a jacket, a blue bandanna, and a baseball bat were recovered from the scene.  He did a thorough search of the entire apartment and did not recall seeing anything indicating drug usage.  He stated that he saw Ibrahim at the hospital after the incident and that Ibrahim was wearing a blue latex glove at that time.  Detective Hughes also testified that "nobody identified [Noor] as having a weapon."  (Tr. 99.)  He further testified that his investigation found the that Ibrahim, identified by the victims as the "skinny guy," came into the apartment, ordered people to the ground, and ordered them to give him their wallets, phones, and money, and that appellant was collecting items from the center of the room. (Tr. 102.) Detective Hughes was also called as a witness for appellant.  He then testified regarding one person he interviewed, Muktar Hersi, and reported that he had been chewing a mild form of khat with Abdulkar's guests.

{¶ 7}  Another police officer, Officer Randall Mayhew, testified that he arrived at the Eakin Road apartment shortly after the police had been notified.  He testified that he observed a semi-automatic pistol outside the door.  Upon entering the apartment, he saw upturned furniture and multiple individuals, including two bloody and clearly injured individuals, lying on the floor. One of the two individuals was wearing a blue latex glove. Medics arrived shortly thereafter, attended to those two injured individuals, and transported them to two separate hospitals.

{¶ 8}   Officer Jeffrey Kracht, Jr., testified that he transported various pieces of property taken at the crime scene to the police property room.  Among the property was a black ski mask, a blue and white bandanna, a red baseball bat, and a black hooded jacket.

{¶ 9}   The state then called a number of the individuals who had been present in the apartment at the time of the incident.  Hirsi Hirsi, the victim of the gunshot wound, testified first without an interpreter.  He testified that he was employed by the Ohio Department of Job and Family Services and worked for Access Interpretive Services.

{¶ 10} Hirsi testified that two men came into the apartment and, speaking in English, ordered the people inside to get down and give them their belongings, such as wallets, cell phones, and a laptop computer.  The intruders pushed a television to the floor, breaking it.  One of the intruders, the shorter and smaller one, had a hoodie with a bandanna covering his face, had a gun, and was wearing a blue latex glove.  Upon observing appellant and Ibrahim, Hirsi agreed that appellant was the larger of the two individuals.  Hirsi testified that both intruders were yelling out orders, using profanity, and kicking the people inside.  The larger man took Hirsi's laptop and laptop charger.

{¶ 11} Hirsi also observed a gun being held to the head of the person next to him, Abdi Aden.  Hirsi testified that the gun went off, and the bullet struck Hirsi in the stomach.  Hirsi then observed the beginning of a struggle between the smaller man with the gun and one of the other individuals in the apartment.  Hirsi escaped with another person through the bathroom window and called the police using a neighbor's cell phone.  The state played the 911 call to the police, and the jury heard Hirsi inform the dispatcher that he had just been shot by two robbers, who were black males.  Medics took Hirsi to the hospital where he had surgery and remained hospitalized for over two weeks.  Hirsi further testified that he saw no khat in the apartment and that he did not believe anyone there was either drinking or using khat that night.

{¶ 12} The state next called Mohamed Adan as a witness, who testified through an interpreter.  He stated that he also had been in the apartment at the time of the robbery.  His testimony was consistent with that of Hirsi in that the smaller of the two men had the gun and the larger of the two men was collecting property from the victims.  He further testified that one of the victims, whose name was Ali, grabbed the hand of the smaller man after the gun fired and secured the gun. Adan heard the larger of the two men say

"[s]hoot all [the] motherfucking [sic] niggers."  (Tr. 297.)  Once the gun had been taken from the smaller intruder, the other people in the apartment started fighting back, and at least one individual used a baseball bat to beat the two robbers. At that point, Adan retrieved his cell phone and wallet and assisted Hirsi in escaping through the bathroom window.  Adan testified that he did not see anyone chewing khat at the apartment.

{¶ 13} The state's next witness was Abu Faid Faqi, who also testified through the interpreter.  Faqi's story was consistent with that of the prior two witnesses.  He testified that 10 to 11 people were present in the apartment when the two men entered.  At first, he stated that he did not recall which of the two defendants had the gun, but that, once the gun was taken from one of the men, the situation became "two against ten" and that the people in the apartment kept the two robbers subdued until the police arrived. (Tr. 314.) Faqi also testified that no one at the apartment was using khat that evening and that he had been in the apartment previously and had never seen anyone use khat at the apartment.

{¶ 14} The state called Abdifath Aden, who testified without an interpreter.  He stated that he was the person who had been struck in the head by the gun and that the gun discharged at that time.  He stated that the smaller guy was the one holding the gun. The larger man, who did not have a gun, demanded he hand over his wallet and phone, which Aden did.  The remainder of Aden's testimony concerning the event was consistent with that of the prior witnesses. He stated that he was transported to the hospital after the police arrived, the wound from the blow was closed with several staples, and he was left with a scar on the side of his head.

{¶ 15} The state's next witness was Hiss Ismail, who testified through the interpreter.  His testimony was consistent with that of the prior witnesses in that he testified that two men came in with their faces covered, the skinnier man had the gun, the men were using profanity in addressing the people in the apartment and were yelling and demanding property, the robberies occurred over the course of approximately 30 minutes, and eventually one of the individuals grabbed the gun, prompting the others to fight back.  In addition, Ismail testified that he was kicked by the smaller robber and struck with the back of the gun prior to it being taken away from the robber. He identified Ibrahim in court as being the man who had the gun.  He testified that the apartment was

not known as a place where drug activities took place and that, to his knowledge, no one was using drugs in the apartment on the night of the robbery.

{¶ 16} The state then called the person who resided at the apartment, Farheyo Abdulkar. She testified, through the interpreter, that she was one of the first persons in Columbus to be able to access Somali television programs via Apple TV and that, because of that fact, people came to her house on the day of the robbery to watch Somali programs. She stated that two men forced the door open and came in and that she did not know them, nor had she invited them. Her description of the two men and their activities was consistent with that of the prior witnesses. She testified that the smaller man had the gun and had at one point pushed it to the back of her head. She stated that the larger man kicked her twice. She further added that, after the group had taken control of the scene, the two men attempted to escape, but the group stopped them and they were beaten, including being beaten with a baseball bat. She stated that many of the occupants of the apartment used the bat to hit the robbers. She acknowledged that it was common for people to gather at her apartment and denied that anyone in her apartment that night was in possession of drugs or was even discussing drugs on the night of the robbery.

{¶ 17} Hashim Abdulle was another victim of the robbers and testified without an interpreter. Like the others, he testified that the two intruders, one smaller than the other, demanded his property. He testified that the smaller guy had the gun. He also testified that he was kicked while on the floor. After the intruders had been overtaken by the occupants of the apartment, Abdulle placed a 911 call. He testified that the intruders never left the apartment after having been subdued and were lying on the floor of the apartment when the police arrived. He acknowledged that he was smoking a legal tobacco-like product in a hookah at the apartment. But he testified that there was "no way" that anyone in the apartment was using or selling any drugs. (Tr. 555.)

{¶ 18} Abdulkadir Aden testified, through the interpreter, that he was also in the apartment at the time of the robbery. He testified that the men ordered him to the floor and that the larger of the two men took property out of his pockets, including a cell phone and approximately $30. He further testified that, after the robbers had been subdued, he recognized the smaller of the two robbers as a relative of family friends. At trial, he identified Ibrahim as one of the robbers. He testified that the larger robber appeared to

be in charge and was giving orders to the smaller robber. Aden further testified that, when he heard the gun was secure, he stood up and engaged in the fight. He stated that the incident lasted approximately 30 to 40 minutes. He testified that no one in the apartment was using drugs or khat that night.

{¶ 19} The state also called Ali Abdullahi, who testified without an interpreter and stated that he also was robbed at the apartment by two individuals who were wearing masks—one skinny, one chubby—and that the skinny one had a gun. He testified that both used profanity in ordering them to the floor and ordering them to give them their wallets, phones, and money. Abdullahi, however, had neither a wallet nor a phone, and the robbers took only a dollar or two from him. He testified that he believed the chubby guy was in charge and was giving orders to the man with the gun. He further testified that it was he, Abdullahi, who grabbed the gun and that he then told the others, in Somali, to "[g]et them, get them." (Tr. 609.) He further testified that he was frightened that the intruders might get the gun back and, therefore, he took the gun out of the apartment and put it down in the hallway, rather than putting it on the table in the apartment, as had been suggested by the police during the 911 call that had been made by another victim. He testified that no one used khat in the apartment that night.

{¶ 20} The state called Amoreena Pauley, a forensic scientist employed by the Columbus police department, who conducted DNA testing. She testified that DNA taken from the grip of the handgun retrieved at the scene matched the DNA obtained from an oral swab taken from Ibrahim. Appellant could not be excluded as a contributor to DNA taken from the black hooded jacket, but Ibrahim could. Appellant could be excluded as a contributor to DNA samples found on a ski mask, but Ibrahim could not. DNA from a blue bandanna taken from the scene matched that of appellant. Blood taken from the baseball bat also matched the DNA of appellant.

{¶ 21} Appellant did not testify at trial; however, his counsel called Detective Todd Cress as a witness. Detective Cress testified that, on the evening of the incident, he assisted Detective Hughes by interviewing several of the victims, including Ali Abdullahi. After reviewing his summary from the interviews, he testified that witness Ali Abdullahi indicated to him that the skinny subject was giving the orders.

{¶ 22} Ibrahim testified in his own defense without an interpreter.  He testified that he was 25 years old and had lived in the United States for over half of his life and was an acquaintance with the occupant of the apartment, Abdulkar.  He testified that his uncle had at one time been married to her and had purchased khat from her in the past.  He testified that he had on prior occasions gone to Abdulkar's apartment to pick up khat for his uncle, and that, on the night in question, he and appellant had walked to the apartment to pick up khat for that uncle.  He acknowledged that he had been wearing a knit hat but said that he wore it because it was a cold night and denied that it was pulled over his face when he entered the apartment.  He stated that he knocked on the door and was told to come in.  He further testified that it was common for people to go to the apartment to chew khat.  According to Ibrahim, he got into an argument with one of the individuals at the apartment while he was waiting for Abdulkar to get khat from a back room.  He testified that Abdulkar brought the drug to him, but he did not have enough money to pay for it and an argument escalated into a fight.

{¶ 23} Ibrahim further testified that appellant had initially been waiting outside the apartment but entered only after the gunshot.   Ibrahim denied that the gun was his and also denied knowing where the gun had come from.  He further denied having worn a blue latex glove and stated that the whole thing was a setup.

### D. *Conviction and Sentence*

{¶ 24} The trial court found appellant guilty of the WUD charge. The state dismissed the robbery counts stated in the indictment.  The jury found appellant guilty of all of the remaining charges and specifications alleged in the indictment.

{¶ 25} The trial court sentenced appellant to ten years on the aggravated burglary count, five years on each of the two felonious assault counts, three years on each of the eleven aggravated robbery counts, three years on each of the eleven kidnapping charges (to run concurrently with the aggravated robbery charges), three years on the WUD, and three years on each of the three firearm specifications.  The aggregate prison sentence totaled 65 years.  In addition, the court notified appellant of a five-year period of post-release control.

## II.  Assignments of Error

{¶ 26} Appellant timely appealed from his conviction, raising five assignments of error, as follows:

> [1.] THE TRIAL COURT ERRED WHEN IT REFUSED TO INSTRUCT THE JURY ON THE MENTAL ELEMENTS REQUIRED TO CONVICT THE DEFENDANT AS AN ACCOMPLICE THEREBY RELIEVING THE STATE OF ITS OBLIGATION TO PROVE THE MENTAL ELEMENTS OF THE CHARGED OFFENSES, THEREBY DEPRIVING THE DEFENDANT OF HIS RIGHT TO TRIAL ON THE MENTAL ELEMENTS OF THE ALLEGED CRIMES.
>
> [2.] THE DEFENDANT WAS DEPRIVED OF HIS RIGHT TO A FAIR TRIAL AND DUE PROCESS OF LAW WHEN POLICE OFFICERS WERE ALLOWED TO TESTIFY THAT CERTAIN WITNESSES FOR THE STATE WERE BEING TRUTHFUL AND WERE ALLOWED TO PRESENT THEIR OPINIONS THAT THE ROBBERIES HAD OCCURRED.
>
> [3.] THE TRIAL COURT ERRED WHEN IT FAILED TO APPOINT AN INTERPRETER QUALIFIED BY THE SUPREME COURT AND BY FAILING TO RECORD THE FOREIGN LANGUAGE TESTIMONY AS REQUIRED BY LAW.
>
> [4.] THE TRIAL COURT ERRED WHEN IT REFUSED THE DEFENDANT'S REQUEST TO INSTRUCT ON TRESPASS AS A LESSER INCLUDED OFFENSE OF AGGRAVATED BURGLARY.
>
> [5.] THE TRIAL COURT ERRED WHEN IT ENTERED JUDGMENT AGAINST THE DEFENDANT ON THE ELEVEN KIDNAPPING COUNTS WHEN SUCH COUNTS WERE ALLIED OFFENSES TO THE AGGRAVATED ROBBERY CHARGES.

## III. Analysis—Appeal

### A.  Alleged Defective Instructions

{¶ 27} We begin by analyzing appellant's first assignment of error. The state contended that appellant was guilty of aggravated robbery in that he or his codefendant, Ibrahim, had a deadly weapon on or about his person and displayed, brandished or used it in the commission of a robbery, or that appellant aided and abetted Ibrahim in the

aggravated robbery.  *See*  R.C. 2911.01(A)(1).   In his first assignment of error, appellant argues that the trial court should have instructed the jury on the mental culpability required to support his conviction on a complicity theory; i.e., that he was an aider or abettor.

{¶ 28} Appellant suggests that the state's entire case against him was predicated upon the ability to establish guilt as an accomplice.  He argues no witness testified that appellant had a deadly weapon in his possession during the robbery but only that Ibrahim did.  Indeed, in closing arguments, the prosecutor acknowledged that, "[i]f you believe the evidence, Mohamed Ibrahim [appellant's codefendant] had a gun." (Tr. 762.) Accordingly, appellant asserts that he could only be found guilty of aggravated robbery, felonious assault, and the firearm specifications on the theory that he was an aider and abettor of Ibrahim.  He argues as well that the kidnapping and aggravated burglary charges were predicated upon the aggravated robbery, felonious assaults, and possession of a firearm charge, and, therefore, he could only be convicted of those offenses as an aider or abettor as well.  Appellant argues that the instructions were infirm because they did not address the requisite mental intent required for conviction as an aider or abettor.

{¶ 29} The record reflects that appellant's counsel orally requested the court to instruct the jury that "an accomplice must share in the intent of the principal before liability can attach to the accomplice for the acts of the principal." (Tr.  739.)  Appellant also submitted a written request for that jury instruction.

{¶ 30} Crim.R. 30(A) provides, in part, that "[o]n appeal, a party may not assign as error the giving or the failure to give any instructions unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection."  Accordingly, where no objection to jury instructions has been lodged, an appellate court undertakes a plain-error analysis of the instructions, and all but plain error is deemed waived. *State v. Graggs*, 10th Dist. No. 09AP-339, 2009-Ohio-5975, ¶  30, citing *State v. Long*, 53 Ohio St.2d 91 (1978). The Supreme Court of Ohio has, however, determined that "a party does not waive objections to the trial court's charge by failing to formally object where: (1) the record affirmatively shows the trial court has been fully apprised of the correct law governing a material issue in dispute; and (2) the requesting party has been unsuccessful in obtaining the inclusion of that law in the charge

to the jury." *State v. Butler*, 10th Dist. No. 98AP-55 (Oct. 22, 1998), citing *State v. Wolons*, 44 Ohio St.3d 64 (1989), paragraph one of the syllabus.

{¶ 31} Here, the state did not argue that appellant's requested instruction was an incorrect statement of law but, rather, argued that the instruction was not necessary. Furthermore, appellant was unsuccessful in convincing the judge to include the requested instruction. The following exchange occurred at the charging conference:

> MR. SABOL [appellant's counsel]: * * * I'm asking for an instruction that an accomplice must share the intent of the principal before liability can attach to the accomplice for the acts of the principal. * * *
>
> MR. WODARCYK [for the state]: * * * The instructions taken as a whole more than adequately let this jury know what needs to be proven in this case. I don't believe this is necessary, and I think its confusing. An accomplice must share in the intent of the principal before liability can attach to the accomplice for the acts of the principal. * * *
>
> THE COURT: * * * I don't think we need that additional instruction. But the record shows you offered it.

(Tr. 739-41.)

{¶ 32} We find that appellant met both prongs of the *Butler* test. Accordingly, appellant is not required to demonstrate that the trial court committed plain error relative to its instructions.

{¶ 33} We acknowledge that "[t]rial courts have the responsibility to give all jury instructions that are relevant and necessary in order for the jury to properly weigh the evidence and perform its duty as the fact-finder." *Columbus v. Aleshire*, 187 Ohio App.3d 660, 2010-Ohio-2773 (10th Dist.), ¶ 51. But, in reviewing a court's refusal to give a requested instruction, "we must determine whether the trial court's decision constituted an abuse of discretion under the facts and circumstances of the case." *Aleshire* at ¶ *52,* citing *State v. Smith*, 10th Dist. No. 01AP-848, 2002-Ohio-1479, citing *Wolons* at **68**. Moreover, an appellate court will not reverse a conviction in a criminal case due to jury instructions unless it finds that the jury instructions amounted to prejudicial error. *Id.*

{¶ 34} We use "a three-part test to determine when failing to give a requested instruction constitutes reversible error: (1) the requested instruction must be a correct

statement of the law; (2) the requested instruction must not be redundant of other instructions; and (3) failure to give the requested instruction must have impaired the requesting party's theory of the case." *State v. Dodson*, 10th Dist. No. 10AP-603, 2011-Ohio-1092, ¶ 6, citing *Gower v. Conrad*, 146 Ohio App.3d 200, 203 (10th Dist.2001). *Accord State v. McDowell,* 10th Dist. No. 10AP-509, 2011-Ohio-6815, ¶ 26. Moreover, "[w]hen reviewing a specific challenged instruction on appeal, the instruction should not be judged in isolation, but instead, within the context of the overall charge." *Aleshire* at ¶ 52, citing *State v. Price*, 60 Ohio St.2d 136 (1979), paragraph four of the syllabus. That is " '[a] jury charge must be considered as a whole and a reviewing court must determine whether the jury charge probably misled the jury in a matter materially affecting the complaining party's substantial rights.' " *State v. Horton,* 10th Dist. No. 03AP-665, 2005-Ohio-458, ¶ 50, quoting *Becker v. Lake Cty. Mem. Hosp. W.*, 53 Ohio St.3d 202, 208 (1990); *see also Price* at paragraph four of the syllabus; *State v. Hardy*, 28 Ohio St.2d 89, 92 (1971).

{¶ 35} We first consider whether the proposed instruction is a correct statement of law. The complicity statute, R.C. 2923.03, provides in part that:

> (A) No person, *acting with the kind of culpability required for the commission of an offense*, shall do any of the following:
>
> * * *
>
> (2) Aid or abet another in committing the offense[.]

(Emphasis added.)

{¶ 36} In interpreting the complicity statute, the Supreme Court of Ohio held in *State v. Johnson*, 93 Ohio St.3d 240 (2001), that:

> To support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and *that the defendant shared the criminal intent of the principal.* Such intent may be inferred from the circumstances surrounding the crime.

(Emphasis added.) *Id.* at syllabus.

{¶ 37} Furthermore, the Ohio Jury Instructions for aiding and abetting read as follows:

> The defendant is charged with complicity in the commission of the offense of (specify offense). Before you can find the defendant guilty, you must find beyond a reasonable doubt, that on or about the _____day of _____, _____, and in _____ (County) (other jurisdiction), Ohio, the defendant (*insert applicable culpable mental state if one is required for the commission of the principal offense*) * * *
>
> * * *
>
> (A)(2) (aided or abetted) another in committing the offense of (specify offense).

(Emphasis added.) *Ohio Jury Instructions*, CR Section 523.03(1)(A)(2) (Rev. Dec. 10, 2011).

{¶ 38} Appellant's proposed instruction, that an accomplice must share in the intent of the principal before liability can attach to the accomplice for the acts of the principal, is consistent with R.C. 2923.03(A)(2), as construed in *Johnson* and outlined in the Ohio Jury Instructions. Therefore, it was a correct statement of law. Appellant has therefore satisfied the first prong of the *Dodson* test.

{¶ 39} We next consider the second prong of the *Dodson* test—whether the requested instruction was redundant of other instructions. The state argued that the proposed instructions were repetitive and unnecessary. The trial court agreed. We, however, disagree. Although the trial court may have repeated the definition of aider or abettor and repeated the instruction that mere presence is not enough to convict appellant of aiding or abetting, it did not refer to the mental culpability required in order to convict him as an aider or abettor.

{¶ 40} It is important to note that the court did not instruct the jury as suggested by the Ohio Jury Instructions. Rather, after instructing the jury on the elements of aggravated burglary, the court instructed the jury that:

> Either Defendant may be convicted of aggravated burglary in Count One as an aider or abettor. An aider or abettor is one who aids, assists, or encourages another to commit a crime

and participates in the commission of the offense by some act, word or gesture. Aid means to help, assist or strengthen. Abet means to encourage, counsel, incite or assist. The mere presence of either Defendant at the scene of the crime and guilty knowledge of the crime are not enough to convict him of aiding and abetting.

(Tr. 828.) After instructing the jury on the elements of each of the remaining offenses (felonious assault, kidnapping, aggravated robbery), the court instructed that "[e]ither Defendant may be convicted of [felonious assault/kidnapping/aggravated robbery] as an aider or abettor. That term has already been defined for you. The mere presence of either Defendant at the scene of the crime and guilty knowledge of the crime are not enough to convict him of aiding and abetting." (Tr. 830-31, 834, 838-39.)

{¶ 41} As noted above, the Ohio Jury Instructions suggest that, when instructing on the elements of aiding and abetting, courts "insert [the] applicable culpable mental state if one is required for the commission of the principal offense." In this case, the court did not give the instructions suggested in the Ohio Jury Instructions. Rather, in the context of explaining the elements of each principal offense, it provided definitions for culpable mental states as noted in the paragraphs below. The court did not, however, charge the jury to apply a particular mental state to the aider or abettor analysis.

{¶ 42} The statute defining aggravated burglary provides, in relevant part, that no person shall trespass in an occupied structure "with purpose to commit * * * any criminal offense." R.C. 2911.11(A). Accordingly, the Supreme Court of Ohio has stated that the culpable mental state for aggravated burglary is "purposeful." *State v. Fry*, 125 Ohio St.3d 163, 2010-Ohio-1017, ¶ 44. In this case, the underlying criminal offenses in question were theft and/or aggravated robbery and/or kidnapping. In the context of explaining the elements of aggravated burglary, the court instructed the jury on the meaning of trespass—that a person *knowingly* enters or remains on the premises of another. The court then provided a definition of the culpable mental state of "knowingly." Continuing with its instructions on the principal offense of aggravated burglary, the court instructed the jury on what it means to act "purposely." It also stated that the purpose to commit either the offense of theft, and/or aggravated robbery and/or kidnapping was an essential element of the offense of aggravated burglary. Following these instructions, the court

gave the general instruction described above regarding aiding or abetting. The court did not, however, instruct the jury that, in order to convict appellant of complicity in the commission of aggravated burglary, it would have to find that appellant, with purpose to commit theft and/or aggravated robbery and/or kidnapping, aided or abetted Ibrahim in committing the same. Furthermore, if the jury were able to infer that it was required to apply a culpable mental state to aiding or abetting, the court gave no indication which of the two culpable mental states it previously explained, knowingly or purposely, applied.

{¶ 43} Next, we turn to the crime of felonious assault. The culpable mental state for the principal offense of felonious assault is "knowingly." R.C. 2903.11. In the context of explaining the elements of felonious assault, the court instructed the jury that "knowingly" had already been defined for them. The court did not instruct the jury that, in order to be convicted of complicity in the commission of felonious assault, it would have to find that the appellant knowingly aided or abetted Ibrahim in committing the same.

{¶ 44} The offense of kidnapping involves conduct of removing another person from their location or restraining another person. In this case, the culpable mental state is that the removal or restraint was "for any of the following purposes: [to facilitate the commission of aggravated robbery and/or to terrorize the victim]." R.C. 2905.01(A)(2) and (3). In this case, and in the context of explaining the elements of kidnapping, the court instructed the jury that "purpose" had already been defined for them. The court also instructed that "[t]he purpose to facilitate the commission of the offense of aggravated robbery is an essential element of the offense of kidnapping" and that the offense of aggravated robbery would be defined for the jury shortly thereafter. (Tr. 834.) The court did not instruct the jury that, in order to be convicted of complicity in the commission of kidnapping, it would have to find that appellant, with purpose to facilitate the commission of aggravated robbery and/or to terrorize the victim, aided or abetted Ibrahim in committing the same.

{¶ 45} With respect to the offense of aggravated robbery, the culpable mental state for the theft element of the offense "incorporates the mens rea of the underlying theft offense." *State v. Wesson*, 137 Ohio St.3d 309, 2013-Ohio-4575, ¶ 29; R.C. 2911.01(A)(1). R.C. 2913.02, the theft statute, provides that "[n]o person, with purpose to deprive the

owner of property or services, shall knowingly obtain or exert control" over property or services of another in certain identified ways, including threat and intimidation. The mens rea for theft, therefore, is that a person acts "with purpose to deprive the owner of property or services" and also acts "knowingly" in obtaining or exerting control over the property. *See State v. Allen*, 4th Dist. No. 00CA24 (Feb. 27, 2002); *see also State v. Wilson*, 10th Dist. No. 05AP-747, 2006-Ohio-3103, ¶ 14 (theft by deception). In the context of explaining the elements of aggravated robbery, the court instructed the jury that "the purpose to commit the offense of theft is an element of the offense of aggravated robbery." (Tr. 837.) It then explained the elements of theft followed by the instruction that "[p]urposely and knowingly have already been defined for you." (Tr. 837.) The court did not instruct the jury that, in order to be convicted of complicity in the commission of aggravated robbery, it would have to find that appellant, with purpose to deprive the owner of property or services, knowingly aided or abetted Ibrahim in committing the same. Furthermore, if the jury were able to infer that it was required to apply a culpable mental state to aiding or abetting, the court did not indicate that both culpable mental states applied.

{¶ 46} It is not enough that the jury could have speculated from the given instructions that, in order to be convicted of aiding or abetting, appellant must have had the mental culpability of the principal offense—it should have been so instructed. Furthermore, many of the principal offenses in this case are predicated upon underlying offenses; i.e., theft, aggravated robbery or kidnapping. (Felonious assault is the only offense in this case which does not depend on an underlying offense.) In some cases, the mental culpability of the principal offense and the underlying offense differ. With this in mind, we find the trial court erred in not instructing the jury that, in order to be convicted of aiding or abetting, appellant must have shared the culpable *mental state for the commission of the principal offense*. *Accord State v. Cummings*, 10th Dist. No. 90AP-1144 (Apr. 21, 1992) (trial court erred in not instructing the jury that a necessary element for convicting a person of complicity is the same culpability required for the commission of the offense); *State v. Moody*, 10th Dist. No. 98AP-1371 (Mar. 13, 2001) (prejudicial error where court refused to give instruction that appellant had to share the same purpose as the principal offender with respect to the underlying offense). Therefore, we find that

the requested instruction was not redundant of other instructions given by the court and that the second prong of the *Dodson* test is satisfied.

{¶ 47} Finally, we consider the third prong of the *Dodson* test and consider whether the court's failure to give the requested instructions impaired appellant's theory of the case. Appellant's counsel's opening statement included the following statement: "Mr. Noor, when he went into an apartment, *had no idea* what was going on." (Emphasis added.) (Tr. 31.) During closing argument, appellant's counsel argued:

> Whatever happened between Mr. Ibrahim and the people in that apartment, whatever happened to ignite the events that led to the tragedy that led us here today, [had] nothing to do with Mr. Noor 'cause Mr. Noor wasn't in the apartment when those things occurred.
>
> * * *
>
> Most importantly, Ali Abdullahi, the State's big evidence that Mr. Noor was in on it was what? The chubby guy was giving the orders. The chubby guy was giving the orders. [Sic.] That's what he said on the stand, and that's some pretty strong evidence.
>
> Aid and abet, to incite, to encourage. That's what he said up there to you. Thank goodness we had Detective Cress here. Now, Mr. Abdullahi spoke with Detective Cress when this happened. The day of. The day of. [Sic.] And what did he say? The skinny suspect was the one giving the orders. That's a big difference.
>
> That's the case—the State's case on the aiding and abetting. That's the State trying to prove that Mr. Noor was working in concert with Mr. Ibrahim. And he almost proved that by saying the chubby guy was the one orchestrating it. The chubby—chubby guy is the one giving the order. But we heard from the detective today that no, that's not true. He said the skinny guy was the one giving the orders.
>
> * * *
>
> The testimony was that he orchestrated it, and that's just not true.
>
> * * *

You see two kids walking down the street. One of them pulls out a baseball, throws it toward a window, and they both start running. Call the cops. What do you say? They threw a baseball through the window naturally. They threw a baseball through the window. Does that mean the kid that didn't have the ball was in on it? Not necessarily. And it certainly doesn't mean that he's the one that actually committed the throwing. That's the natural way to think.

* * *

In fact, when chubby guy was thrown in there, you found out it's not true. When they said chubby guy was the one directing them on what to do, not true. Not true. It was skinny guy. I submit to you, it's just as likely that no matter what Mr. Ibrahim may or may not have done -- and I have no idea what to do about this. That's not my problem, because I don't represent Mr. Ibrahim.

Whatever he may or may not have done, once Mr. Noor went into that chaotic situation, everything's happening around him, it's perfectly reasonable for people to say they were in on it. They robbed us. They had a gun, without having the hindsight to look back and say, you know what, he was just coming in and may not have known what was going on.

(Tr. 781, 785, 787, 792, 796.)

{¶ 48} The state argues that appellant was tried as a principal offender and that, under the theory of aiding or abetting, both appellant and Ibrahim were principal offenders. R.C. 2923.03(F) states that any person who violates the complicity statute "is guilty of complicity in the commission of an offense, and shall be prosecuted and punished as if he were a principal offender." Appellant argues that his theory of the case was that he "had no idea" and "may not have known" what was going on in the apartment. In other words, (1) that appellant was not a principal offender, and (2) that appellant did not aid or abet the principal offender. Appellant implies that, during its deliberations, if the jury rejected the state's theory that appellant was a principal offender (which it may have done since there was no evidence that appellant had the gun), the jury would have then turned to the state's alternate theory that appellant aided or abetted Ibrahim.

{¶ 49} If indeed these were the jury's only options, we would agree that proper instructions on aiding and abetting would have been critical. "It is not sufficient that the jury may speculate from the charge that, in addition to the elements defined in the charge, an additional element is necessary for a conviction." *Moody*, quoting *Cummings*. The instructions presented in this case, as outlined above, required the jury to infer not only that the additional element of a culpable mental state was required but also to infer which of several culpable mental states applied. Nevertheless, a careful reading of the jury instructions reveals that the jury could have found appellant guilty–as the principal offender–even if they had found that he did not possess the firearm.

{¶ 50} Neither the kidnapping nor the aggravated burglary charges required the jury to find appellant possessed the firearm. With regard to kidnapping, the jury was instructed that appellant could be found guilty of the same if they found that he, by force or threat, restrained the victims of their liberty, with the purpose to facilitate the commission of aggravated robbery "and/*or* terrorize" the victims. With regard to aggravated burglary, the jury was instructed that appellant could be found guilty of the same if they found that he, by force, trespassed an occupied structure of another who was present therein, with purpose to commit aggravated robbery "and/*or*" kidnapping "and/*or*" theft, and he had a deadly weapon "and/*or*" inflicted, attempted or threatened to inflict physical harm upon another who was present therein. Several of the witnesses testified that the larger intruder was either shouting demands, yelling obscenities, and collecting money and items from the victims. One witness testified that appellant kicked him twice. This evidence could have been the basis of a jury finding that appellant terrorized the victims, committed theft, and inflicted, attempted or threatened to inflict physical harm upon another. The jury was instructed on the mens rea required to make a finding of guilty as a principal offender. Furthermore, there is no indication in the record that appellant objected to the "and/*or*" instructions noted above. Therefore, we cannot find that the lack of mens rea instructions for aider or abettor with regard to the kidnapping and aggravated burglary impaired appellant's theory of the case.

{¶ 51} Next, we must consider the aggravated robbery, felonious assault, and the firearm specifications. The principal offense of aggravated robbery, as instructed, required the jury to find that appellant had a firearm "on or about his person or under his

control" and that appellant "displayed and/or used the weapon." The firearm specification, as instructed, required the jury to find that appellant "had a firearm on or about his person or under his control while committing the [offense] and did display and/or use the firearm to facilitate the [offense].[2] Thus, with both the aggravated robbery offense and the firearm specifications, it was necessary for the jury to find appellant had the firearm. There being no evidence that he did, appellant would argue that the jury's only option was to consider whether appellant was an aider or abettor. The principal offense of felonious assault, as instructed, required the jury to find that appellant "caused serious physical harm" to the victim "*or*" "caused physical harm [to the victim] by means of a deadly weapon." There being no evidence that appellant had the firearm and no evidence of serious physical harm, appellant would likewise argue the jury's only option was to consider whether appellant was an aider or abettor.

{¶ 52} In light of our finding that the instructional errors did not impair appellant's theory of the case with regard to aggravated burglary and kidnapping, we find they likewise did not impair appellant's theory of the case with regard to aggravated robbery, felonious assault, and the firearm specifications. While it is true that the lack of evidence that appellant possessed the firearm would require the jury to only consider whether appellant aided or abetted, we do not accept that appellant's theory of the case was that he was not an accomplice to Ibrahim. It would be inconsistent for us to find otherwise. Where appellant did not object to instructions requiring the jury to consider whether he was a principal offender of aggravated burglary and kidnapping, he cannot now credibly argue that he was not an aider or abettor as to the aggravated robbery, felonious assault or firearm specifications. We, therefore, cannot say that the third prong of the *Dodson* test has been satisfied.

---

[2] A firearm specification is not a separate offense but, rather, a sentencing provision that enhances the penalty for the associated predicate offense. *See State v. Worth*, 10th Dist. No. 10AP-1125, 2012-Ohio-666, ¶ 49; *State v. Jennings*, 10th Dist. No. 09AP-70, 2009-Ohio-6840, ¶ 38 ("The firearm specification is not a separate offense but a sentencing provision."). Accordingly, appellate courts have held that a firearm specification does not carry a mens rea separate from commission of the predicate offense. *See State v. Stevens*, 2d Dist. No. 23817, 2010-Ohio-4766, ¶ 18 ("Because a firearm specification cannot stand alone, without an underlying offense, 'a firearm specification does not require its own mens rea.' ") (citation omitted); *State v. Gilbert*, 8th Dist. No. 90615, 2009-Ohio-463, ¶ 16; *State v. Cook*, 9th Dist. No. 24058, 2008-Ohio-4841, ¶ 8.

{¶ 53} The third prong of the *Dodson* test in essence addresses the question of whether an error is harmless. Crim.R. 52 states that "[a]ny error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." Regarding the appropriateness of finding harmless error, the Supreme Court of Ohio has stated: "[T]he cases where imposition of harmless error is appropriate must involve either overwhelming evidence of guilt or some other indicia that the error did not contribute to the conviction." *State v. Ferguson*, 5 Ohio St.3d 160, 166, fn. 5 (1983). Based on our finding that the instructional errors did not impair appellant's theory of the case, we conclude that the errors did not contribute to the conviction and, therefore, were harmless. Accordingly, we overrule appellant's first assignment of error.

### B. Alleged Error in Allowing Credibility Testimony

{¶ 54} In his second assignment of error, appellant argues that the trial court improperly allowed police officers to testify as to the credibility of the state's witnesses who were present in the apartment.

{¶ 55} In presenting appellant's case, defense counsel called and questioned several police officers concerning statements made on the night of the robbery by one or more of the robbery victims, presumably to illustrate conflicts between their statements on that night and their testimony at trial. On cross-examination, the prosecutor asked Detective Hughes whether there was "anything about the interview with Mr. Abdulkadir Aden that suggested that this robbery did not take place?" (Tr. 719); whether "Muktar [said] anything to you that indicated that the robbery did not take place?" (Tr. 721); and whether there was "anything about your conversation with Mr. Hirsi that indicated to you that the robbery did not occur?" (Tr. 715.) Moreover, another police officer, Detective Todd Cress, was asked whether, at any time, witness Ali Abdullahi "[said] anything that gave you reason to believe that the robbery did not occur?" (Tr. 732.)

{¶ 56} Appellant argues that these questions were improper and allowed the officers to improperly express opinions that the state's witnesses were telling the truth on the night of the robbery. But the record reflects that no contemporaneous objection was made either to the prosecutor's questions or to the officers' answers. We must determine, therefore, whether it was plain error to allow this testimony. *State v. McDowall*, 10th Dist. No. 09AP-443, 2009-Ohio-6902, ¶ 26 ("Because there was no objection, all

but plain error has been waived."). Moreover, " '[p]lain error consists of an obvious error or defect in the trial proceedings that affects a substantial right [and] * * * reversal is warranted only if the outcome of the trial clearly would have been different absent the error.' " *Id.*, quoting *State v. Lindsey,* 87 Ohio St.3d 479, 482 (2000). Appellate courts notice plain error " 'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.' " *State v. Barnes,* 94 Ohio St.3d 21, 27 (2002), quoting *State v. Long,* 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

{¶ 57} The state contends, initially, that the questions asked did not solicit or produce improper bolstering evidence. It characterizes the questions as inquiry into police evidence-gathering procedures, rather than the solicitation of police opinion as to the credibility of the state's witnesses. The state suggests that a prosecutor may properly ask questions that explain the reason why the police have filed charges against criminal suspects; i.e., that the police accepted the stories given by the victims of crimes at the time of the alleged crimes. The state cites in support our decision in *State v. Nicodemus,* 10th Dist. No. 96APA10-1359 (May 15, 1997).

{¶ 58} In *Nicodemus,* a defendant argued that an investigating detective was wrongly permitted to vouch for the credibility of the victims of alleged sexual offenses. We stated:

> The testimony of the detective in question was more in the nature of testimony about police procedures than an expressed opinion about the truthfulness of the girls. Certainly, the decision of a police detective to file charges in a given situation involves some assessment of credibility by the detective, so a detailed elaboration of a police protocol will reveal information about a detective's assessment of credibility. *Still, to the extent that such credibility assessment can be kept away from a trier of fact, especially a jury, it should be kept away.*

(Emphasis added.) *Id. See also State v. Lee,* 10th Dist. No. 02AP-1340, 2003-Ohio-4059, ¶ 14 (citing *Nicodemus*).

{¶ 59} Appellant's argument objecting to the form of the questions asked by the prosecutors and quoted above, accordingly, is not completely devoid of merit. But even assuming, arguendo, that these questions were improper, they were not of a nature likely

to influence the jury's verdict, as they did not constitute an obvious error or defect in the trial proceedings affecting a substantial right and were not plain error. We do not believe that the jury's evaluation of the credibility of the state's witnesses in comparison to that of Ibrahim or the ultimate outcome of the trial clearly would have been different had the questions and answers not been given. We, therefore, hold that the court's allowance of the cross-examination at issue in appellant's second assignment of error was not plain error.

{¶ 60} Accordingly, we overrule appellant's second assignment of error.

### C. Error as to Interpreter

{¶ 61} In his third assignment of error, appellant challenges the interpreter who interpreted the testimony of several witnesses whose primary language was Somali. Appellant also asserts that the trial court erred in failing to record testimony given in Somali through the use of video or audio recordings or a bilingual court reporter.

{¶ 62} Before the state called Mohamed Adan, the first witness who testified in Somali, the record reflects the following:

> [MR. WODARCYK]: And, Judge, we do have an interpreter for our first witness [of the day].
>
> THE COURT: Would you stand up, sir? Raise your right hand
>
> Thereupon the interpreter was duly sworn.

(Tr. 270-71.)

{¶ 63} No objection was raised at that time as to the qualifications of the interpreter nor to the form of the oath.

{¶ 64} At the conclusion of Adan's testimony, the following exchange occurred out of the presence of the jury:

> MR. SABOL [counsel for appellant]: I don't speak Somali, so I have no idea, but my client informs me that he believes some of the translation was off. I spoke with Mr. Basnett [counsel for Ibrahim]. I spoke with his client who believes the same. I had spoken with the interpreter beforehand, asked him if he was certified by the Ohio Supreme Court. And I know they have some certifications. I do not know if

they have certifications in Somali. I know we've had that issue over in Municipal Court.

He indicated to me that he was beforehand, so I was comfortable going ahead. But I don't think he was being deceptive or anything at all. But he came up to me afterwards and said he was not, in fact, certified by the Supreme Court and does have some sort of papers that he's been in this court before. What that means I don't know, but I thought I would just bring it to the Court's attention just to ensure that we're on all fours here.

THE COURT: Well, I'll just ask the interpreter, what is your situation with regard to –

THE INTERPRETER: Exactly the way he put it is not correct. He said are you certified to the court. I did not really hear the Supreme Court. I was contemplating. I said, yes, I'm certified. And they gave us letters that have been in a lot of cases in this court, federal court and municipal and general, all of them.

And actually this year what we've done as interpreter company, they gave us letters and make sure everybody went through all the training and everything. And they gave us letters to show every judge that certifies, says that I am certified, and that's what we go by.

If it's a specific Ohio State Supreme Court certification, and then, no, I do not have that one, and that can be arranged by the interpreter services. But I interpret all the cases, and I've been there. And I haven't had a problem before. That's where I'm at now, and I have my letter to show you.

THE COURT: Okay. Do we have your name on the record?

THE INTERPRETER: You should mention it, but let me get you my name, my badge, and the letter that I got.

THE COURT: Okay. Fine.

MR. BASNETT [counsel for Ibrahim]: Your Honor, just for the record, my client, after I was questioning the last witness, when I sat down, he bent over and just said that he was concerned because he didn't believe that every – that the interpretations was going word for word. He thought that

some of the things were being left out.  We just ask for the interpretation to go word for word.  I don't have any problems with the interpreter.  I've worked with him before, but my client's concern is everything being interpreted.

THE COURT: Yes, I would only state that the interpretation should be word by word if possible.  Probably not always possible. If your client knows that something is being misleading, then if he could point that out, we'll deal with it.

MR. BASNETT:  Thank you, Your Honor.

* * *

THE COURT: Can we just make a copy of this?  Be right back.

THE INTERPRETER: Sure, sure.

(Discussion held off the record.)

THE COURT: We'll make a copy of his credentials and make it a part of the record.

(Tr. 302-03.)

{¶ 65} Consistent with this exchange, the record includes a copy of an undated letter printed on the stationery of a Columbus company, ASIST Translation Services.  The letter, signed by an individual whose position was "Manager Interpreting Services," reads as follows:

Abdulkadir Hagi is a language-skilled interpreter[3] and has worked with ASIST Translation Services since 2006. Abdulkadir has passed the third party proficiency exam and has had medical, legal and social service trainings throughout the course of his career.  Abdulkadir continues to further his knowledge through offered trainings in the community.

---

[3] Although the record does not reveal how the interpreter or his agency define the phrase "language-skilled interpreter," Sup.R. 88(D)(3) states that an interpreter "who demonstrates to the court proficiency in the target language and sufficient preparation to properly interpret the case proceedings * * *  shall be styled a 'language-skilled foreign language interpreter.' "

{¶ 66} Appellant notes that R.C. 2311.14(A)(1) provides that, "[w]henever because of a hearing, speech, or other impairment a party to or witness in a legal proceeding cannot readily understand or communicate, the court shall appoint a qualified interpreter to assist such person." In addition, R.C. 2311.14(B) provides that, "[b]efore entering upon official duties, the interpreter shall take an oath that the interpreter will make a true interpretation of the proceedings to the the party or witness." Moreover, appellant observes that Sup.R. 88(D) establishes certain procedures to assure that a foreign language interpreter is qualified.

{¶ 67} Appellant contends that the trial court failed to comply with either R.C. 2311.14 or Sup.R. 88(D). He further argues that Crim.R. 22 requires that, "[i]n serious offense cases all proceedings shall be recorded" and suggests that the court must employ either a bilingual court reporter or use video or audio recordings to comply with the rule where non-English speakers participate as witnesses or parties. In support, appellant cites *Columbus v. Lopez-Antonio*, 153 Ohio Misc.2d 4, 2009-Ohio-4892.

{¶ 68} The state, in response, argues that this assignment of error fails absent a finding of plain error. Indeed, our review of the record discloses that appellant did not object to the court interpreter's qualifications, did not request that the proceedings be electronically recorded, did not request that a bilingual court reporter be obtained, and did not contemporaneously state an objection to any of the interpretations of the testimony. The state further suggests that, while *Lopez-Antonio* provides guidance where a trial court must determine whether an interpreter is qualified to provide interpretation services, the decision does not address the issue of whether a trial court committed plain error relative to the use of a foreign language interpreter.

{¶ 69} Sup.R. 88(A) provides that a court must appoint a foreign language interpreter when: (1) a party or witness who is non-English speaking or has limited English proficiency requests an interpreter and the court determines the services of an interpreter are necessary for the meaningful participation of the party or witness; or (2) absent a request from a party or witness, the court concludes that a party or witness is non-English speaking or has limited English proficiency, and the court determines the services of an interpreter are necessary for the meaningful participation of the party or witness. When an interpreter is required, Sup.R 88(D)(1) requires courts to appoint "a

Supreme Court *certified* foreign language interpreter." (Emphasis added.) If a Supreme Court certified interpreter "does not exist or is not reasonably available and after considering the gravity of the proceedings and whether the matter could be rescheduled to obtain a Supreme Court certified foreign language interpreter, a court may appoint *a provisionally qualified* foreign language interpreter." (Emphasis added.) Sup.R. 88(D)(2). Finally, if a Supreme Court certified foreign language interpreter or provisionally qualified foreign language interpreter "does not exist or is not reasonably available and after considering the gravity of the proceedings and whether the matter could be rescheduled to obtain a Supreme Court certified foreign language interpreter or provisionally qualified foreign language interpreter, a court may appoint a foreign language interpreter who demonstrates to the court proficiency in the target language and sufficient preparation to properly interpret the case proceedings. Such interpreter shall be styled a '*language-skilled* foreign language interpreter.' " (Emphasis added.) Sup.R. 88(D)(3).

{¶ 70} Here, it appears the court did not use a certified or a provisionally qualified interpreter. The interpreter presented the court with a letter describing himself as a "language skilled" interpreter. Sup.R. 88(D)(3) states that, when using a language skilled interpreter, the court "shall summarize on the record its efforts to obtain a Supreme Court certified foreign language interpreter or provisionally qualified foreign language interpreter and the reasons for using a language-skilled foreign language interpreter." Furthermore, "[t]he language-skilled foreign language interpreter's experience, knowledge, and training should be stated on the record," and "[e]ach language-skilled foreign language interpreter shall take an oath or affirmation under which the interpreter affirms to know, understand, and act according to the code of professional conduct for court interpreters * * * as set forth in Appendix H to [Sup.R. 88]."

{¶ 71} Although the interpreter's knowledge and training were stated on the record in this case, it is unclear from the record whether the oath administered to the interpreter required him to affirm that he knows, understands, and acts according to the code of professional conduct for court interpreters. Furthermore, the record does not reveal a summary of the court's efforts to obtain a Supreme Court certified or provisionally

qualified Somali interpreter or the reasons for using a language-skilled Somali interpreter. Therefore, it appears the trial court did not follow all the requirements of Sup.R. 88.

{¶ 72} Nevertheless, we note again that no objection was raised as to the qualifications of the interpreter, to the form of the oath, or to the lack of summary of the court's efforts to use a certified or provisionally qualified interpreter.  Accordingly, we apply a plain-error standard, which requires a determination that the outcome of the trial clearly would have been different absent the error.  *See McDowall* at ¶ 26.  We do not find the outcome of the trial  would have been different.

{¶ 73} First, when appellant's counsel expressed concern that the interpretation "was off" (Tr. 302) and that the interpreter was not certified by the Supreme Court, the court asked the interpreter for his qualifications on the record and to clarify whether or not he was certified by the Supreme Court. The court instructed the interpreter to interpret the testimony word for word to the extent possible and advised appellant and Ibrahim that they should bring to the attention of the court any additional concerns they might have concerning the interpretation. The record does not reflect that appellant thereafter raised any issues concerning the interpreter's qualifications or the interpretation itself.  Furthermore, appellant did not argue before the trial court or here that a certified or provisionally qualified Somali interpreter existed and was reasonably available.

{¶ 74} Second, the state called nine witnesses in this case. Of those witnesses, five testified through the interpreter (Adan, Faqi, Ismail, Farheyo Abudlkar, and Abdulkadir Aden).  But four of the witnesses testified in English without an interpreter (Hirsi, Aden, Abdulle, and Abdullahi), including the individual who suffered the gunshot wound (Hirsi), and the individual who took the gun away from the smaller robber (Abdullahi). The testimony of all nine of these witnesses, whether provided in English or through the interpreter, was remarkably consistent—a circumstance that rebuts any inference that appellant was prejudiced by a misleading or faulty interpretation of testimony given in Somali. With all this in mind, we do not find the outcome of the trial would have been different and, therefore, no plain error existed.

{¶ 75} Moreover, we have previously held that the law does not require that a transcript include non-English versions of testimony.  In *State v. Vu*, 10th Dist. No. 09AP-

606, 2010-Ohio-4019, ¶ 27, where an appellant suggested that the transcripts were inadequate because they only included the English version of the testimony, we observed:

> Appellant also suggests the transcripts are inadequate because they consist only of the English version of the testimony. We, however, are not aware of any requirement that the transcript include non-English, in this case Vietnamese, versions of the testimony, particularly in light of the fact that testimony is taken by a stenographer who may or may not be conversant in non-English languages.

{¶ 76} Consistent with our statement in *Vu*, we are aware of no statute or rule requiring that testimony or other trial proceedings occurring in a foreign language be electronically recorded. Furthermore, appellant has not provided us, nor are we aware of, any authority supporting the proposition that due process imposes such a requirement. Accordingly, we find that plain error did not occur relative to the use of the interpreter in this case.

{¶ 77} We therefore overrule appellant's third assignment of error.

### D. Refusal to Instruct on Lesser-Included Offense of Trespass

{¶ 78} In his fourth assignment of error, appellant argues that the trial court erred in refusing to instruct the jury on trespass as a lesser-included offense of aggravated burglary. "An offense is a lesser-included offense of another where: (1) the offense carries a lesser penalty; (2) the greater offense cannot, as statutorily defined, ever be committed without the lesser offense, as statutorily defined, also being committed; and (3) some element of the greater offense is not required to prove commission of the lesser offense." *State v. Hubbard*, 10th Dist. No. 11AP-945, 2013-Ohio-2735, ¶ 37, citing *State v. Deem*, 40 Ohio St.3d 205, 209 (1988).

{¶ 79} The crime of trespass is a lesser-included offense of aggravated burglary. *State v. Lawson*, 2d Dist. No. 23456, 2010-Ohio-3114, ¶ 28; *State v. Divincenzo,* 9th Dist. No. 05CA0105-M, 2006-Ohio-6330, ¶ 34; *State v. Leavitt*, 11th Dist. No. 92-L-197 (Mar. 25, 1994). *See also State v. Johnson*, 10th Dist. No. 86AP-868 (Feb. 18, 1988) (affirming conviction of criminal trespass as a lesser-included offense of aggravated burglary); *State v. Mickens,* 10th Dist. No. 08AP-743, 2009-Ohio-2554, ¶ 68 (recognizing trespass as a lesser-included offense of burglary and citing *State v. Wamsley*, 117 Ohio

St.3d 388, 2008-Ohio-1195, ¶ 14, for the proposition that trespass is an element of aggravated burglary); *State v. Shedwick*, 10th Dist. No. 11AP-709, 2012-Ohio-2270, ¶ 11-12 (observing that R.C. 2911.11(A) defines aggravated burglary to include as an element the crime of trespass as defined in R.C. 2911.10).

{¶ 80} A court must give an instruction on a lesser-included offense when " 'sufficient evidence is presented which would allow a jury to *reasonably* reject the greater offense and find the defendant guilty on a lesser included * * * offense.' " (Emphasis sic.) *Hubbard* at ¶ 37, quoting *State v. Shane*, 63 Ohio St.3d 630, 632 (1992). That is, a court must instruct on a lesser-included offense only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction on the lesser-included offense. *Hubbard*, citing *State v. Freeman,* 10th Dist. No. 07AP-337, 2007-Ohio-6859, ¶ 14, citing *State v. Carter*, 89 Ohio St.3d 593 (2000). In making this determination, " '[t]he court must view the evidence in the light most favorable to the defendant.' " *Id.*, quoting *State v. Campbell*, 69 Ohio St.3d 38, 47-48 (1994); *State v. Wilkins*, 64 Ohio St.2d 382, 388 (1980).

{¶ 81} As is the case when reviewing a trial court's jury instructions generally, the proper standard of review for an appellate court in reviewing whether to give an instruction as to a lesser-included offense is whether the trial court's refusal to give a requested jury instruction constituted an abuse of discretion under the facts and circumstances of the case. *State v. Parnell*, 10th Dist. No. 11AP-257, 2011-Ohio-6564, ¶ 21-27. The term "abuse of discretion" connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable. *State v. Clark*, 71 Ohio St.3d 466, 470 (1994).

{¶ 82} In this case, the trial court stated that the evidence produced at trial was such that "[i]t's either aggravated burglary or nothing," effectively determining that the evidence did not reasonably support an acquittal on the crime of aggravated burglary but a conviction of the crime of trespass. (Tr. 738.) It therefore refused to instruct the jury on that lesser-included offense. The trial court's determination did not reflect an abuse of discretion.

{¶ 83} Appellant correctly observes that Ibrahim testified that appellant did not enter the apartment but, instead, waited in the hall for Ibrahim to come out and entered

the apartment only after appellant heard the gunshot.  Appellant argues that, if the jury believed Ibrahim's testimony, appellant might well have been acquitted of aggravated burglary but convicted of misdemeanor trespass for entering the apartment without permission at a time subsequent to the aggravated burglary and other crimes committed solely by Ibrahim.

{¶ 84} However,  an "instruction on [a] lesser included offense is not warranted * * * every time 'some evidence' is presented to support the lesser offense. Instead, a court must find 'sufficient evidence' to 'allow a jury to *reasonably* reject the greater offense and find the defendant guilty on a lesser included (or inferior degree) offense.'  " (Emphasis sic.; citation omitted.)  *State v. Benit*, 10th Dist. No 11AP-490, 2011-Ohio-6832, ¶ 6, quoting  *State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, ¶ 192, quoting  *Shane* at 632-33. The proper standard of review for an appellate court is whether the trial court's refusal to give a requested jury instruction constituted "an abuse of discretion *under the facts and circumstances of the case.*" (Emphasis added.)  *Wolons,* 44 Ohio St.3d 64, at 68. For example, a defendant's own testimony that he did not intend to kill his victim does not entitle him to a lesser-included offense instruction "if the evidence on whole does not reasonably support an acquittal on the murder offense and a conviction on a lesser offense." *State v. Willis*, 8th Dist. No. 99735, 2014-Ohio-114, ¶ 51, citing *Campbell* at 47.

{¶ 85} We agree with the state's contention that, in this case, there was not sufficient evidence which would have permitted the jury to reasonably conclude that appellant merely entered the apartment without permission after appellant heard the gunshot.  Accordingly, reviewing the evidence in a light most favorable to appellant, we reject his argument that the jury could reasonably have found on the evidence presented that appellant was not guilty of aggravated burglary, but guilty of criminal trespass.  The trial court did not abuse its discretion in refusing to instruct on criminal trespass.

{¶ 86} Accordingly, we overrule appellant's fourth assignment of error.

### E. Allied Offenses—Aggravated Robbery and Kidnapping

{¶ 87} In his fifth assignment of error, appellant argues that the 11 kidnapping counts of which appellant was convicted were allied offenses of the aggravated robbery charges of which he was convicted.  He argues that the conduct that constituted the aggravated robberies in this case was the same conduct that resulted in the kidnapping

offenses; i.e., ordering the robbery victims to lie down and stay still while the robbers obtained their valuables. He contends that the convictions merge, pursuant to *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, even though the court ordered that the sentences for the kidnapping and aggravated robbery charges run concurrently.

{¶ 88} R.C. 2941.25, Ohio's allied-offenses statute, provides that, "[w]here the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one." R.C. 2941.25(A). We have recognized that, pursuant to *Johnson*, " '[i]f the offenses correspond to such a degree that the conduct of the defendant constituting commission of one offense constitutes commission of the other, then the offenses are of similar import.' " *State v. Broomfield,* 10th Dist. No. 12AP-469, 2013-Ohio-1676, ¶ 8, quoting *Johnson* at ¶ 51. Pursuant to the allied-offenses statute, where it is determined that the defendant has been found guilty of allied offenses, "the trial court must accept the state's choice among allied offenses, 'merge the crimes *into a single conviction for sentencing,* and impose a sentence that is appropriate for the merged offense.' " (Emphasis sic.) *State v. Bayer*, 10th Dist. No. 11AP-733, 2012-Ohio-5469, ¶ 21, quoting *State v. Wilson*, 129 Ohio St.3d 214, 2011-Ohio-2669, ¶ 13. We review de novo a trial court's ruling as to whether convictions merge under the allied-offenses doctrine. *State v. Corker*, 10th Dist. No. 13AP-264, 2013-Ohio-5446, ¶ 28, citing *State v. Roush,* 10th Dist. No. 12AP-201, 2013-Ohio-3162, ¶ 47.

{¶ 89} A conviction for aggravated robbery, as defined in R.C. 2911.01(A)(1), requires proof that a defendant brandished a deadly weapon in order to facilitate a theft offense. *Corker a*t ¶ 29. Pursuant to R.C. 2905.01, kidnapping requires proof that a defendant restrained another of his liberty or removed him from the place where he was found. *Id.*

{¶ 90} The Supreme Court of Ohio has recognized that the commission of aggravated robbery necessarily involves restraint of the victim. *Corker*, citing *State v. Jenkins,* 15 Ohio St.3d 164, 198 (1984), fn. 29*; see also Broomfield* at ¶ 14. However, aggravated robbery and kidnapping are not allied offenses of similar import where the restraint is prolonged beyond the time required to commit the aggravated robbery. *Corker* at ¶ 30, citing *State v. Logan*, 60 Ohio St.2d 126 (1979), syllabus.

{¶ 91} In *Broomfield*, we surveyed recent cases from this court analyzing merger of kidnapping and aggravated robbery offenses. In the earliest of those cases, *State v. Davis,* 10th Dist. No. 09AP-869, 2011-Ohio-1023, we held that kidnapping did not merge with aggravated robbery where the victims were held at gunpoint while the robbers demanded money and then were bound and driven around for several hours while the defendant continued to demand money.

{¶ 92} In the next case, *State v. Sidbeh,* 10th Dist. No. 10AP-331, 2011-Ohio-712, the defendant restrained the liberty of the occupants of a home while others rummaged through the house. We held that the kidnapping and aggravated robbery offenses merged, as the restraint lasted no longer than necessary to complete the aggravated robbery, and the movement of the victims was not substantial so as to indicate significance independent of committing the aggravated robbery. *Broomfield* at ¶ 16, citing *Sidbeh* at ¶ 5.

{¶ 93} In *State v. Vance,* 10th Dist. No. 11AP-755, 2012-Ohio-2594, we held that kidnapping and aggravated robbery offenses did not merge where the defendant forced the victim into her minivan, demanded money, drove her to an ATM where he withdrew money from her account, drove her to a drug house where he ordered her to remain in the van, and then returned and drove her to another location, where he exited the car and told her to drive away. The incident lasted approximately one hour and fifteen minutes. In finding that the aggravated robbery and kidnapping offenses did not merge, we noted that the kidnapping was prolonged and involved transporting the victim over a considerable distance. *Broomfield* at ¶ 18, citing *Vance* at ¶ 10-16.

{¶ 94} Finally, in *Broomfield* itself, we held that movement of victims during the course of a robbery had "significance independent of the robbery" and that the offenses did not merge. We noted that the kidnapping exposed the victim to an increased risk of substantial harm and that one victim was moved to a separate bedroom location within the house before the defendant sexually assaulted the victim. *Id.* at ¶ 19.

{¶ 95} In the case before us, the state's witnesses testified that the 11 victims were threatened, assaulted, and restrained of their liberty for approximately 20 to 40 minutes, at which time the robbery victims overcame the robbers, terminating the robbery. For purposes of the allied-offense analysis, we find these facts to be similar to the facts in

*Sidbeh.* We further consider our holding in *Broomfield* to be instructive. Accordingly, we find the aggravated robbery offenses in this case merge with the kidnapping offenses.

{¶ 96} We therefore sustain appellant's fifth assignment of error.

## IV. Conclusion

{¶ 97} For the foregoing reasons, we overrule appellant's first, second, third, and fourth assignments of error and sustain appellant's fifth assignment of error. Therefore, we affirm in part and reverse in part the judgment of the Franklin County Court of Common Pleas and remand this cause to that court for further proceedings, consistent with this decision, with regard to the aggravated robbery and kidnapping offenses.

*Judgment affirmed in part, reversed in part,*
*and cause remanded with instructions.*

O'GRADY and T. BRYANT, JJ., concur.

T. BRYANT, J., retired, of the Third Appellate District, assigned to active duty under the authority of the Ohio Constitution, Article IV, Section 6(C).

_____