[Cite as *State v. Walker*, 2018-Ohio-5172.]

# Court of Appeals of Ohio

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

---

### JOURNAL ENTRY AND OPINION
### No. 106571

---

## STATE OF OHIO

### PLAINTIFF-APPELLEE

vs.

## CHARLES WALKER

### DEFENDANT-APPELLANT

---

**JUDGMENT:**
AFFIRMED

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-17-615721-C

**BEFORE:** Jones, J., E.A. Gallagher, A.J., and E.T. Gallagher, J.

**RELEASED AND JOURNALIZED:** December 20, 2018

**ATTORNEY FOR APPELLANT**

Joseph V. Pagano
P.O. Box 16869
Rocky River, Ohio 44116


**ATTORNEYS FOR APPELLEE**

Michael C. O'Malley
Cuyahoga County Prosecutor

BY: Kevin R. Filiatraut
Assistant County Prosecutor
The Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113


LARRY A. JONES, SR., J.:

{¶1} Defendant-appellant Charles Walker ("Walker") appeals his numerous convictions related to his involvement in a drive-by shooting that occurred in Cleveland in March 2017, and his 71 years-to-life sentence. Two people died as a result of the shooting: David Wilder ("Wilder") and a juvenile, T.J. Two others were shot at: Aevonte Gaddis ("Gaddis") and a juvenile, A.J. Walker was arrested with his codefendants Kassius Williams ("Williams") and Terrell Gray ("Gray") on the day of the shooting.[1] For the reasons that follow, we affirm.

## I. Procedural History

{¶2} In April 2017, Walker, Williams, and Gray were charged under a single indictment. The indictment contained 15 counts, and 14 of them charged Walker. Counts 1 and 2 charged

---

[1]Williams pleaded guilty, and he appeals his conviction and sentence in *State v. Williams*, 8th Dist. Cuyahoga No. 106570. Gray's case proceeded to a jury trial, separate from Walker's jury trial, after which he was convicted and he appeals his conviction and sentence in *State v. Gray*, 8th Dist. Cuyahoga No. 106828. All three appeals have been designated as companion cases.

aggravated murder of Wilder and T.J., respectively; Counts 3 and 7 charged murder of Wilder; Counts 5 and 9 charged murder of T.J.; Counts 4 and 6 charged discharge of a firearm on or near prohibited premises; Counts 8 and 10 charged felonious assault of Wilder and T.J., respectively; Counts 11 and 12 charged felonious assault of Gaddis and A.J., respectively; Count 13 charged improperly handling firearms in a motor vehicle; and Count 15 charged carrying a concealed weapon. Counts 1 through 13 contained one-, three-, and five-year firearm specifications, as well as forfeiture specifications relating to three separate firearms.

{¶3} In October 2017, Walker's case proceeded to a jury trial. The state presented 12 witnesses, and after it rested its case, Walker made a Crim.R. 29 motion for judgment of acquittal, that was denied. Walker did not present any witnesses. After its deliberations, the jury found Walker guilty as indicted. The trial court sentenced Walker to an aggregate term of 71 years to life, that included consecutive sentences.

## II. Trial Testimony

{¶4} The trial testimony established that the shooting occurred in the early afternoon of Saturday, March 25, 2017. Three vehicles were involved in the incident: (1) a black Volkswagen, driven by Walker, with codefendant Williams as the front-seat passenger, and codefendant Gray in the back; (2) a red Saturn SUV, driven by victim Gaddis, with juvenile victim A.J. in the front passenger seat, and juvenile victim T.J. in the back; and (3) victim Wilder's gray Nissan. There were three crime scenes: the initial two crime scenes consisted of the areas around East 79th Street and Woodland Avenue and East 89th Street and Woodland Avenue; the third crime scene was St. Vincent Charity Hospital.

**Aevonte Gaddis**

{¶5} Gaddis testified that he was driving to a laundromat when he saw cousins A.J. and

T.J., who were his friends. Gaddis picked them up — A.J. got in the front and T.J. got in the back. As Gaddis was driving on Woodland Avenue, he noticed that a black Volkswagen began "chasing" his car, so he sped up. Gaddis testified that he reached speeds as high as 70 to 100 mph in an attempt to escape the Volkswagen. Despite his effort to escape the car, the driver of the Volkswagen pulled up aside Gaddis's vehicle and started shooting at them. Gaddis saw a "drum" gun magazine hanging outside of one of the windows of the Volkswagen, and heard someone in the Volkswagen call out his sister's name. The car Gaddis was driving belonged to his sister.

{¶6} According to Gaddis, he, A.J., and T.J. all ducked so as to not get shot. Eventually, the Volkswagen drove away, and A.J. told him that T.J. had been shot. Gaddis pulled onto a strip mall parking lot at East 79th and Woodland Avenue.

{¶7} Gaddis testified that neither he, A.J., nor T.J. had weapons on their persons and there were no weapons in their car. The only information Gaddis knew about the occupants of the Volkswagen was that there were three of them, but he could not identify any of them.

**A.J.**

{¶8} According to A.J., as Gaddis was driving down Woodland Avenue, he heard him say, "something about to happen," and then the shooting started. Like Gaddis, A.J. testified that he did not know any of the occupants in the Volkswagen and he could not identify any of them. Also like Gaddis, A.J. denied that he, T.J., or Gaddis had a weapon.

**First Responders and Partial Eyewitness**

**Officer Wynn**

{¶9} Officer Wynn responded to the area of East 89th Street and Woodland Avenue where Wilder was. When the officer arrived, EMS and fire department personnel were

attending to Wilder. At the scene, the officer talked to a partial eyewitness to the event, Daresha Thomas ("Thomas"). Officer Wynn described Thomas as "distraught" and "still being in the moment of the event."

### Eyewitness: Daresha Thomas

{¶10} Thomas did not testify at trial; rather, Officer Wynn testified about her statements, over the defense's objection.

{¶11} Thomas was driving on Woodland Avenue in the area of the shooting and saw the vehicles being driven by Gaddis and Walker; according to Thomas they were being driven erratically. Thomas then noticed a gray Nissan stopped in traffic, so she turned around to see if she could offer assistance and saw Wilder in the car, shot. Thomas called 911. Of seeing Wilder, Thomas said that she "had never seen anything like this before, she had never seen a deceased person other than at a funeral."

### Officer Allen

{¶12} Meanwhile, Officer Allen had responded to the area of East 79th Street and Woodland Avenue, which was where Gaddis, A.J., and T.J. were. The officer described Gaddis and A.J. as being "really upset." The SUV had "bullet holes throughout" it. Officer Allen testified that T.J. was in the backseat and there was blood all over it. She also saw laundry in the back. The officer searched the car and did not find any weapons in it.

## St. Vincent Charity Hospital

{¶13} During the course of the shooting, codefendant Gray sustained an injury to his hand and Walker drove him to St. Vincent Charity Hospital; Walker and codefendant Williams remained at the hospital with Gray. A security guard at the hospital observed Walker "pacing around frantically." The guard also saw Gray give a "big-eyed look" at Walker's hip. The

guard then looked at Walker's hip and saw that he had a gun; the guard called the police.

{¶14} Officer Gibb responded to the hospital and arrested Walker for the gun violation; weapons are generally banned in the hospital. Walker told the officer that he had a carrying concealed weapon license, which Walker produced. The license had expired on March 13, 2017, days prior to the March 25, 2017 date in question.

{¶15} Officer Gibb was aware that Walker, Williams, and Gray were tied to the shooting on Woodland Avenue. Williams and Gray were also arrested at the hospital. Gray told the officer that he was shot during a robbery.

**Collection of Evidence**

{¶16} Samples to test for gunshot residue were taken from Walker and Williams at the hospital.

{¶17} The police observed that Wilder's car had one bullet defect to the windshield. The red SUV, which had been driven by Gaddis, had numerous bullet defects and broken glass. Walker's car had no visible damage from gunfire; one spent shell casing was recovered from its trunk. The police collected 36 shell casings and various bullet fragments on Woodland Avenue between East 89th Street and East 79th Street. All three vehicles were towed from their respective locations to a Cleveland Police Department impound lot.

{¶18} In addition to Walker's gun (a Beretta 9 mm handgun), two other weapons were recovered: a 9 mm Astra handgun, which Gray had legally purchased the day before the shooting, was recovered from the Volkswagen underneath the front passenger seat, near the rear, where Gray had been sitting; and a .40 caliber Glock handgun was recovered from the Volkswagen by where Williams had been sitting.

**Autopsies**

{¶19} The Cuyahoga County Medical Examiner performed autopsies on Wilder and T.J. Wilder suffered one gunshot wound to his head. The bullet entered through Wilder's left eye and caused fatal damage to his brain. The injury caused Wilder to die instantly. The bullet was recovered during the autopsy.

{¶20} T.J. suffered three gunshot wounds to his head. Two of the bullets grazed across him, and the third entered his head close to his left ear, causing fatal damage to his brain. The third bullet was recovered during the autopsy.

**Video Surveillance**

{¶21} The police recovered video surveillance from the following three area businesses: (1) the Farm Market located at East 90th Street and Woodland Avenue; (2) Danzey's Discount Mart located at East 79th Street and Woodland Avenue, and (3) a convenience store located at the intersection of Woodland and Woodhill Avenues.

{¶22} The surveillance from the convenience store at Woodland and Woodhill Avenues captured four different angles. The videos were shown to the jury in their entirety.

{¶23} An outside camera recorded the Volkswagen driven by Walker arrive and park at 1:20 p.m. Williams went into the store first, followed by Gray, and then Walker. It appeared that both Williams and Gray were holding something at the right sides of their waists as they entered the store.

{¶24} An inside camera recorded Williams and Gray standing in line with items to purchase. Walker was only briefly in the store; he gave money to Williams and then left. While Williams was paying for his items, the drum gun magazine can be seen in Williams's waist, because the weight of it apparently weighed down his pants so that the sweatshirt he was wearing no longer covered it. Other apparently unsuspecting customers, including young

children, were also in the store.

{¶25} When all three were back in the Volkswagen, Walker pulled forward to exit the parking lot. The red Saturn SUV drove past the convenience store at 1:26:55 p.m., and four seconds later, Walker pulled out of the parking lot and drove in the same direction as the red SUV.

{¶26} Video from two cameras from the Farm Market were shown to the jury. The video showed Walker driving his car at a high rate of speed toward Gaddis's car, and then Walker's car passing Gaddis's car on the driver's side. The cars drove out of view, and then seconds later, Wilder's car came to a stop in the lane in which he was driving.

**Scientific Evidence**

### Gunshot Residue

{¶27} Lisa Przepyszny ("Przepyszny"), a trace evidence analyst at the Cuyahoga County Medical Examiner's Office, testified about results of the gunshot residue samples she processed. She found gunshot residue on all four doors of Walker's car and Gaddis's car, as well as inside of both vehicles. Przepyszny also found gunshot residue on Walker's hands, Williams's hands, Gaddis's sweatshirt, A.J.'s jacket, and Gray's sweatshirt.

{¶28} According to Przepyszny, gunshot residue particles can de deposited on the clothing and skin of people who did not fire a gun, but were in close proximity to a fired weapon. Thus, for example, Przepyszny testified that although there was gunshot residue inside of Gaddis's car, that does not establish that a weapon was fired from inside that vehicle. When people in one vehicle drive up to another vehicle and fire a large number of shots into that vehicle, gunshot residue can be deposited on the inside of the target vehicle even if no one inside the target vehicle fired a shot.

**Firearms Examination**

{¶29} Three firearms and multiple shell casings, bullets, and bullet fragments were examined by Kristen Koeth ("Koeth"), a firearms examiner at the Cuyahoga County Medical Examiner's Office. As mentioned, one gun was recovered from Walker, one was attributed to Williams, and one was attributed to Gray. All three weapons were operable. Also submitted were 36 spent shell casings from the crime scene, two bullets from inside Gaddis's car, one bullet recovered from T.J.'s body, and one bullet recovered from Wilder's body.

{¶30} Koeth testified that all of the bullets and shell casings came from either Williams's or Gray's guns; none were fired from Walker's weapon. Specifically, she determined that seven of the shell casings were fired from Gray's gun and 29 were fired from Williams's gun. The two bullets recovered from Gaddis's car were fired from Gray's gun. The two bullets recovered from T.J. and Wilder during their autopsies were fired from Williams's gun.

**Homicide Investigation**

{¶31} The lead detective on the case was Detective Borden. Detective Borden testified that the damage to Gaddis's car was consistent with someone from the Walker's car firing at the driver's side of Gaddis's car as it passed. The damage was also consistent with T.J. being struck during the initial gunfire as Walker's car began to pass, and Wilder being struck with a bullet at the end of the gunfire, as Walker's car passed Gaddis's car entirely.

{¶32} According to Detective Borden, because Walker's car did not have any bullet damage to it, Gray was sitting behind Williams in the car, and the gunfire occurred as Walker's car passed Gaddis's car on the driver's side with the bullets going back toward Gaddis's car, the reasonable conclusion was that Williams shot Gray in the hand as they were both firing at Gaddis's car.

### III. Assignments of Error

I. Appellant's Sixth Amendment right to confrontation was violated when the trial court admitted hearsay over appellant's objection.

II. The trial court erred by denying appellant's objection to portions of the aiding and abetting instruction.

III. Appellant's Sixth and Fourteenth Amendments rights under the United States Constitution were violated based upon ineffective assistance of counsel.

IV. Appellant's convictions were not supported by sufficient evidence and the trial court erred by denying his motion for acquittal.

V. The convictions were against the manifest weight of the evidence.

VI. The trial court erred by imposing consecutive sentences and appellant's sentence is contrary to law.

### IV. Law and Analysis

**Right to Confront Eyewitness/Hearsay Testimony**

{¶33} As mentioned, Thomas was a partial eyewitness to the events. She did not testify at trial; rather, Officer Wynn, who spoke to Thomas on the scene, testified about her statements, over the defense's objection. In his first assignment of error, Walker contends that Officer Wynn interrogated Thomas on the scene for the purpose of gathering evidence of a past event to use at a later prosecution and, therefore, the officer's testimony about Thomas's statements were hearsay. We disagree.

{¶34} In *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the United States Supreme Court held that the Confrontation Clause encompasses "testimonial" as opposed to nontestimonial evidence. *Id.* at 68. Although the Court did not define "testimonial," the court discussed three possible definitions of that term, which include: (1) ex parte in-court testimony or its functional equivalent, such as affidavits and prior testimony that

the defendant was unable to cross-examine, or pretrial statements that declarants would reasonably be expected to be used in a prosecution; (2) extra-judicial statements contained in formal testimonial materials such as depositions, prior testimony, or confessions; and (3) statements made under circumstances that would lead an objective witness to believe the statement would be available for use at a later trial. *Id.* at 51-52.

{¶35} In *Davis v. Washington*, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), the United States Supreme Court further considered the meaning of the term "testimonial." The Court found that the Confrontation Clause applies only to testimonial hearsay and not to statements made "to enable police assistance to meet an ongoing emergency." *Id.* at 822. In *Davis*, the victim had made a 911 emergency call, and in the course of that call incriminated the defendant. The Supreme Court, in affirming the lower court's admission of the statements, held that:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later prosecution.

*Id.*

{¶36} To determine "whether a statement is testimonial for Confrontation Clause purposes, courts should focus on the expectation of the declarant at the time of making the statement; the intent of a questioner is relevant only if it could affect a reasonable declarant's expectations." *State v. Stahl*, 111 Ohio St.3d 186, 2006-Ohio-5482, 855 N.E.2d 834, paragraph two of the syllabus.

{¶37} Moreover, proffered hearsay may be admitted where it "falls within a firmly rooted

hearsay exception." *State v. McKenzie*, 8th Dist. Cuyahoga No. 87610, 2006-Ohio-5725, ¶ 26, citing *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980); *see also Crawford* at 68 ("Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law — as does *Roberts*, and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether.").

{¶38} Evid.R. 803(2) defines an "excited utterance" as a statement "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Four prerequisites must be satisfied in order for an excited utterance to be admissible: (1) an event startling enough to produce a nervous excitement in the declarant, (2) the statement must have been made while still under the stress of excitement caused by the event, (3) the statement must relate to the startling event, and (4) the declarant must have personally observed the startling event. *State v. Brown*, 112 Ohio App.3d 583, 601, 679 N.E.2d 361 (12th Dist.1996).

{¶39} Here, Thomas saw two of the cars at issue being driven erratically. She then saw Wilder's car come to a stop in traffic, which prompted her to turn around to see if she could lend assistance. Upon approaching Wilder's car, Thomas saw that Wilder had been shot, was deceased, and she called 911.

{¶40} Offer Wynn arrived shortly thereafter, on what was an active crime scene; Wilder's body was still on scene and was being attended to by emergency medical first responders, and the identities of the perpetrators were unknown at that time. On this record, Thomas's statements to Officer Wynn were to assist the police in an ongoing emergency.

{¶41} Moreover, as the trial court found, Thomas's statements fell under the excited

utterance exception to hearsay rule. Officer Wynn testified that Thomas was "distraught" and described her as "still being in the moment of the event."

{¶42} In *State v. Webster*, 8th Dist. Cuyahoga No. 102833, 2016-Ohio-2624, this court held that statements of witnesses made right after the stress of a criminal event can be both nontestimonial and, therefore, not subject to confrontation under the Sixth Amendment, and excited utterances under Evid.R. 803(2). *Id.* at ¶ 136. For the reasons discussed above, Thomas's statements were both nontestimonial and excited utterances. Therefore, there was no error in their admission.

{¶43} The first assignment of error is overruled.

**Aiding and Abetting Instruction**

{¶44} The state's theory of Walker's involvement in this case was that he, as the driver, aided and abetted Williams and Gray in committing the shootings. In its instructions to the jury, the trial court gave the standard Ohio Jury Instruction ("OJI") on aiding and abetting, over the defense's objection to portions of it. Walker contends in his second assignment of error that the trial court erred in its instructions.

{¶45} The standard OJI included the following: "participation in criminal intent may be inferred from presence, companionship and conduct before *and after* the offenses committed." (Emphasis added.) Walker objected to the "and after" language, contending that he was not charged with obstructing justice and Ohio does not recognize accessory after the fact as an offense.

{¶46} "'Trial courts have the responsibility to give all jury instructions that are relevant and necessary in order for the jury to properly weigh the evidence and perform its duty as the fact-finder.'" *State v. Noor*, 10th Dist. Franklin No. 13AP-165, 2014-Ohio-3397, ¶ 33, quoting

*Columbus v. Aleshire*, 187 Ohio App.3d 660, 2010-Ohio-2773, 933 N.E.2d 317, ¶ 51 (10th Dist.). When reviewing a trial court's jury instructions, the proper standard of review for an appellate court is whether the trial court's refusal to give a requested jury instruction constituted an abuse of discretion under the facts and circumstances of the case. *State v. Rawson*, 2016-Ohio-1403, 62 N.E.3d 880, ¶ 19 (10th Dist.), citing *State v. Stewart*, 10th Dist. Franklin No. 10AP-526, 2011-Ohio-466, ¶ 9.

{¶47} Furthermore, "'[a]n appellate court will not reverse a conviction in a criminal case due to jury instructions unless it finds that the jury instructions amount to prejudicial error.'" *State v. Dodson*, 10th Dist. Franklin No. 10AP-603, 2011-Ohio-1092, ¶ 6, quoting *Aleshire* at *id.*

{¶48} "In Ohio, an offender's complicity to commit a crime may be inferred from the circumstances surrounding the crime, and that may include the offender's presence, companionship, and conduct before *and after* the crime is committed." (Emphasis added.) *State v. Crosby*, 8th Dist. Cuyahoga No. 106504, 2018-Ohio-3793, ¶ 12, citing *State v. Moore*, 7th Dist. Mahoning No. 02 CA 152, 2004-Ohio-2320, ¶ 31, citing *State v. Johnson*, 93 Ohio St.3d 240, 245, 2001-Ohio-1336, 754 N.E.2d 796.

{¶49} In light of the above, the trial court's instruction to the jury on aiding and abetting was a correct statement of the law. Further, the instruction was warranted by the evidence presented. Specifically, the videos demonstrated that Walker waited several seconds after Gaddis's car passed on the street before he exited the convenience store's parking lot. Then he "raced" to catch up to Gaddis's car. Once Williams and Gray started shooting from his car, Walker did not stop or abandon the area so that they would not be able to shoot at Gaddis's car. Rather, he continued to drive until the shooting stopped and then drove Gray to the hospital.

{¶50} On this record, there was no error in the trial court's aiding and abetting

instruction, and the second assignment of error is therefore overruled.

**Ineffective Assistance of Counsel Claim**

{¶51} In his third assignment of error, Walker claims that his trial counsel was ineffective.

{¶52} We review a claim of ineffective assistance of counsel under a two-part test that requires the defendant to demonstrate that: (1) trial counsel's performance fell below an objective standard of reasonable representation; and (2) prejudice arose from the deficient performance. *State v. Bradley*, 42 Ohio St.3d 136, 141-143, 538 N.E.2d 373 (1989), citing *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

{¶53} In evaluating an alleged deficiency in performance, our review is highly deferential to counsel's decisions because there is a strong presumption counsel's conduct fell within the wide range of reasonable professional assistance. *Bradley* at 142-143, citing *Strickland* at 689. Reviewing courts are to refrain from second-guessing the strategic decisions of trial counsel. *State v. Carter*, 72 Ohio St.3d 545, 558, 651 N.E.2d 965 (1995). Debatable trial tactics generally do not constitute a deprivation of effective counsel. *State v. Dean*, 146 Ohio St.3d 106, 2015-Ohio-4347, 54 N.E.3d 80, ¶ 288.

{¶54} To show prejudice, a defendant must prove that the lawyer's deficiency was so serious that there is a reasonable probability the result of the proceeding would have been different. *Strickland* at 694. The benchmark for judging any claim of ineffectiveness is whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. *State v. Frazier*, 61 Ohio St.3d 247, 254, 574 N.E.2d 483 (1991).

{¶55} Walker contends that his trial counsel was ineffective because he failed to

investigate the case prior to it proceeding to trial. Specifically, Walker contends that his counsel failed to (1) "obtain and review exculpatory evidence," (2) utilize a private investigator, (3) obtain "other video footage from the area," and (4) effectively emphasize to the jury that "he was not the shooter and did not participate in the offense."

{¶56} Our review of the record reveals that counsel, who was retained, advocated zealously for Walker both pretrial and during trial. He engaged in pretrial discovery and attempted to protect Walker's interest, for example, by requesting and being granted the right to have a defense expert present during the state's DNA testing.

{¶57} We are not persuaded by any of Walker's contentions. He has not demonstrated that there was any exculpatory evidence or other video footage, for example. His bare assertions, with nothing more, do not demonstrate that counsel's performance fell below an objective standard of reasonable representation or that the outcome of the trial would have been different.

{¶58} The third assignment of error is overruled.


**Sufficiency of the Evidence**

{¶59} For his fourth assigned error, Walker contends that the evidence was insufficient to support the convictions.

{¶60} A claim of insufficient evidence raises the question of whether the evidence is legally sufficient to support the verdict as a matter of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). In reviewing a sufficiency challenge, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable

doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶61} As mentioned, the state's theory of Walker's involvement was that he acted as an aider and abettor as the driver in Williams's and Gray's drive-by shooting. According to Walker, he was merely present when the crimes occurred — he did not know what Williams and Gray were going to do and did not assist them in the shooting.

{¶62} R.C. 2923.03, governing complicity, provides in relevant part that: "(A) No person, acting with the kind of culpability required for the commission of an offense, shall * * * [a]id or abet another in committing the offense." R.C. 2923.03(A)(2).

{¶63} The two mental states the state was required to prove in this case were "purposely" and "knowingly." They are defined under R.C. 2901.22 as follows:

> (A) A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature.
>
> (B) A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact.

{¶64} Mere association with the principal offender is insufficient to convict a defendant as an aider and abettor. *State v. Sims*, 10 Ohio App.3d 56, 58, 460 N.E.2d 672 (8th Dist.1983). Rather, an aider and abettor is "one who assists another in the accomplishment of a common design or purpose; he must be aware of, and consent to, such design or purpose." *Id.* at 58-59. As mentioned, participation in criminal intent may be inferred from presence, companionship,

and conduct before and after the offense is committed. *Crosby*, 8th Dist. Cuyahoga No. 106504, 2018-Ohio-03793, at ¶ 12, citing *Moore*, 7th Dist. Mahoning No. 02 CA 152, 2004-Ohio-2320, at ¶ 31, citing *Johnson*, 93 Ohio St.3d 240, 245, 2001-Ohio-1336, 754 N.E.2d 796.

{¶65} Here, the state presented sufficient evidence to demonstrate that Walker was an aider and abettor in Williams's and Gray's crimes. Specifically, Walker was the driver for the drive-by shooting. The videos provided evidence that Walker waited several seconds after Gaddis's car passed on the street before he exited the convenience store's parking lot. Then he "raced" to catch up to Gaddis's car. Once Williams and Gray starting shooting from his car, Walker did not stop or abandon the area so that they would not be able to shoot at Gaddis's car. Rather, he continued to drive until the shooting stopped and then drove Gray to the hospital. On this record, the state presented sufficient evidence that Walker acted in concert with Williams and Gray.

{¶66} Walker further contends that the evidence was insufficient to support his carrying a concealed weapon conviction because he did not know his permit had expired days earlier. "Anyone who applies for and obtains a CCW license is 100 percent responsible for learning, understanding, and complying with the restrictions and regulations, both state and federal, that coincide with exercising the right to carry a concealed handgun." *State v. Johnson*, 8th Dist. Cuyahoga No. 98001, 2012-Ohio-5069, ¶ 18. In light of the above-cited law, we overrule Walker's contention.

{¶67} The fourth assignment of error is overruled.

**Manifest Weight of the Evidence**

{¶68} For his fifth assigned error, Walker challenges his convictions as being against the manifest weight of the evidence.

**{¶69}** When a conviction is challenged on appeal as being against the weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541. A judgment should be reversed as being against the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

**{¶70}** The gist of Walker's contention in this assignment of error is that his convictions were against the manifest weight of the evidence because Gaddis's and A.J.'s criminal records rendered their testimonies incredible. The jury was aware of their criminal records, and was in the best position to determine the credibility of Gaddis and A.J. after hearing their testimonies and observing their demeanor on the witness stand. *State v. Crisp*, 10th Dist. Franklin No. 06AP-146, 2006-Ohio-5041, ¶ 13.

**{¶71}** A conviction is "'not against the manifest weight of the evidence simply because the jury believed the prosecution testimony.'" *State v. Moore*, 2d Dist. Montgomery No. 20005, 2004-Ohio 3398, ¶ 52, quoting *State v. Gilliam*, 9th Dist. Lorain No. 97CA006757, 1998 Ohio App. LEXIS 3668 (Aug. 12, 1998). The weight to be given to the evidence and the credibility of the witnesses are issues primarily for the trier of fact, and the jury is free to believe all, none or portions of the testimony. *State v. Long*, 127 Ohio App.3d 328, 335, 713 N.E.2d 1 (4th Dist.1998). Thus, the fact that the jury may or may not have found all of a particular witness's testimony to be credible is not a basis for reversal on manifest weight grounds.

**{¶72}** After carefully reviewing the trial court's record in its entirety, we conclude that

the jury did not lose its way in resolving credibility determinations, nor did the convictions create a manifest miscarriage of justice. The jury was in the best position to determine the credibility of the testimony presented, and we decline to substitute our judgment for that of the trier of fact. Consequently, we cannot say that Walker's convictions were against the manifest weight of the evidence.

**{¶73}** The fifth assignment of error is overruled.

**Consecutive Sentences**

**{¶74}** In his final assignment of error, Walker contends that the trial court erred in imposing consecutive sentences on him.

**{¶75}** A trial court must make specified findings pursuant to R.C. 2929.14(C)(4) before it imposes consecutive sentences. *State v. Magwood*, 8th Dist. Cuyahoga No. 105885, 2018-Ohio-1634, ¶ 62. Specifically, the court must find: consecutive terms are required to protect the public from future crime or to punish the offender, (2) consecutive terms are not disproportionate to the seriousness of the conduct and danger posed to the public, and (3) either the offender committed at least one offense while awaiting trial or sentencing, that multiple offenses were part of a course of conduct and the harm caused was so great or unusual that a single term does not adequately reflect the seriousness of the offender's conduct, or that the offender's criminal history is such that consecutive terms are necessary to protect the public. R.C. 2929.14(C)(4); *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, ¶ 22, 26.

**{¶76}** Walker was sentenced along with his codefendant Kassius Williams. In regard to Walker, the trial court merged Counts 3, 4, 7, and 8 into Count 1. It also merged Counts 5, 6, 9, and 10 into Count 2. In sentencing Walker, the court initially stated that he was "going to have

a total commitment of 50 years." The trial court later corrected itself, stating "I was mistaken on Walker. He's doing * * * 71 years to life." The court then made the following findings for the imposition of consecutive sentences relative to both Williams and Walker:

> the consecutive sentences are necessary to protect the public from future crime and to punish the defendant. The consecutive sentences are not disproportionate to the seriousness of the conduct and the danger that the offender poses to the public. And finally, these were two multiple offenses that were committed as part of one or more course of conduct, and the harm caused by two or more of the multiple offenses committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the course of conduct adequately reflects the seriousness of their conduct.

{¶77} Walker first contends that there was a discrepancy between what occurred at sentencing and the trial court's sentencing judgment entry, in that at sentencing the court imposed 50 years to life, but the sentencing entry imposed a sentence of 71 years to life. But as set forth above, at the sentencing hearing, the court made a mistake and corrected its mistake, stating that the sentence was 71 years to life. There is no merit to Walker's contention.

{¶78} Further as set forth above, the trial court made the required findings under R.C. 2929.14(C)(4) for the imposition of consecutive sentences. However, his codefendant Williams raised an issue Walker did not raise, but which we asked counsel in this case to brief: whether the trial court erred in announcing the sentence it was imposing on each defendant prior to making the necessary consecutive sentence findings.

{¶79} After consideration of the parties' briefs on the issue, we conclude that there is no such requirement. Although it is the usual, and arguably better, practice for a trial court to make the consecutive sentence findings before announcing the sentence, there is no requirement that it be done that way. *State v. Romanko*, 8th Dist. Cuyahoga No. 104158, 2017-Ohio-739, ¶ 19 ("There is nothing in R.C. 2929.14(C)(4) (or otherwise) that requires a trial court to articulate its

findings supporting the imposition of consecutive sentences *before* announcing its decision to impose consecutive sentences at a sentencing hearing."). (Emphasis sic.).

{¶80} Finally, we are not persuaded by Walker's contention that, despite making the findings, the sentence was contrary to law. The sentencing judge, who was also the judge who presided over the trial, described this as a "totally horrific" crime that occurred "in the middle of afternoon on a major thoroughfare in the city of Cleveland." "It was a senseless random killing, and no one else is going to be killed by these two people."

{¶81} The trial court found Walker to be the "engineer driving that train; that runaway train down Woodland Avenue." The court further found that Walker "knew what was going on. You knew they had the guns. You chased them from behind, caught up to them while your passenger in the front seat is spraying them with the gun, * * * and the guy in the back seat was getting * * * shots off." The court told Walker that it found him "equally as culpable. You didn't shoot because you had two hands on the wheel. Other than that, you are equally culpable."

{¶82} The record supports the trial court's reasoning. In light of the above, the sixth assignment of error is overruled.

{¶83} Case affirmed in toto.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
LARRY A. JONES, SR., JUDGE

EILEEN A. GALLAGHER, A.J., and
EILEEN T. GALLAGHER, J., CONCUR